**J. M. COUCH**

v.

**MOBIL OIL CORPORATION et al.**

v.

**BECHTEL CORPORATION, Arabian Bechtel Corporation.**

Civ. A. No. 69–H–852.

United States District Court,
S. D. Texas,
Houston Division.

June 7, 1971.

---

David J. Nagle, Nagle & Barr, Houston, Tex., for plaintiff.

James T. Nesbitt, B. Jeff Crane, Jr., Vinson, Elkins, Searls & Smith, E. D. Vickery, Royston, Rayzor & Cook, Houston, Tex., for defendant.

*Memorandum and Order*:

SINGLETON, District Judge.

Plaintiff, a Texas resident, has filed this suit against a Delaware corporation for an accident occurring in Libya, in federal court based on diversity jurisdiction. 28 U.S.C. § 1332. The plaintiff was severely injured in an oil tank explosion when a Mobil employee prematurely turned on a valve that releases gas into the tank before the workers had completed the welding of the tank. The complaint sounds in common law negligence and does not allege the Texas Wrongful Death Statute as grounds for the cause of action. Vernon's Ann.Tex.Rev.Civ.Stat. art. 4678. Bechtel, the subcontractor, has by agreement of the parties been dismissed from this suit.

Upon filing, the plaintiff requested a jury trial according to the procedure set forth in F.R.Civ.P. 38. The plaintiff now petitions the court with a motion to withdraw the jury request. Said motion is hereby denied unless all parties consent under the provisions of F.R.Civ.P. 38(d) to the withdrawal of the jury. The denial of this motion is inextricably entwined in the thorny conflict of laws question raised by this suit. If Libyan law is to be applied, the defendant agrees that a jury is inappropriate because in Libya there

are no juries, and the judge is the sole arbitrator of damages. On the other hand, the defendant refuses to give the consent necessary under F.R.Civ.P. 38 (d) to grant the plaintiff's motion for withdrawal. However, if Texas law is applied a jury upon request would be the accepted method of trial procedure.

The voluminous scholarly writings that have recently been published on this confusing area need not be recited here. Suffice it to say that a trend can be noted towards an interest analysis in the selection of which state's law to apply in a conflict of laws question. But even a mechanical choice of law theory would have applied the procedural rules of the forum court and not the procedural law of the state where the court sits, nor the procedural law of the site of the accident in a case such as the instant one, regardless of the substantive law which is applied.

" * * * there are affirmative countervailing considerations at work here. The federal system is an independent system for administering justice to litigants who properly invoke its jurisdiction. An essential characteristic of that system is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury and, under the influence—if not the command—of the Seventh Amendment, assigns the decisions of disputed questions of fact to the jury. Jacob v. City of New York, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166. * * * We think that in the circumstances of this case the federal court should not follow the state rule. It cannot be gainsaid that there is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts. In Herron v. Southern P. Co. (US) supra, [283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857] the trial judge in a personal-injury negligence action brought in the District Court for Arizona on diversity grounds directed a verdict for the defendant when it appeared as a matter of law that the plaintiff was guilty of contributory negligence. The federal judge refused to be bound by a provision of the Arizona Constitution which made the jury the sole arbiter of the question of contributory negligence. This Court sustained the action of the trial judge, holding that 'state laws cannot alter the essential character or function of a federal court' because that function 'is not in any sense a local matter, and state statutes which would interfere with the appropriate performance of that function are not binding upon the federal court under either the Conformity Act or the "rules of decision" Act.' Id. 283 U.S. at page 94, 51 S.Ct. at page 384. Perhaps even more clearly in light of the influence of the Seventh Amendment, the function assigned to the jury 'is an essential factor in the process for which the Federal Constitution provides.' Id. 283 US at page 95, 51 S.Ct. at page 384. Concededly the Herron Case was decided before Erie R. Co. v. Tompkins [304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188], but even when Swift v. Tyson (US) 16 Pet. 1, 10 L.Ed. 865, was governing law and allowed federal courts sitting in diversity cases to disregard state decisional law, it was never thought that state statutes or constitutions were similarly to be disregarded. Green v. Neal's Lessee (US) 6 Pet. 291, 8 L.Ed. 402. Yet Herron held that state statutes and constitutional provisions could not disrupt or alter the essential character or function of a federal court.

"We have discussed the problem upon the assumption that the outcome of the litigation may be substantially affected by whether the issue of immunity is decided by a judge or a jury. But clearly there is not present here the certainty that a different result would follow, cf. Guaranty Trust Co. of New York v. York, [326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231,] supra, or even the strong possibility that this would be the case, cf. Bernhardt v. Polygraphic Co., [of America, Inc., 350

U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199,] supra. There are factors present here which might reduce that possibility. The trial judge in the federal system has power denied the judges of many States to comment on the weight of evidence and credibility of witnesses, and discretion to grant a new trial if the verdict appears to him to be against the weight of the evidence. We do not think the likelihood of a different result is so strong as to require the federal practice of jury determination of disputed factual issues to yield to the state rule in the interest of uniformity of outcome." Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 539, 78 S.Ct. 893, 901, 2 L. Ed.2d 953 (1958).

The most recent Supreme Court decision in the Erie-York-Byrd line is Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) [in hand service of process] which reaffirms the principle that in diversity cases, regardless of what state law is applied, the Federal Rules of Civil Procedure will always control the manner in which the trial is conducted. Accordingly, F.R.Civ.P. 38 will govern this case.

■ The perplexing entanglement of the substantive nature of the damage issue as a judge, not a jury, determined question in the Libyan Code is surpassed in its delicate nature only by the present confusion in case law on choice of law problems. The rule of Klaxon Co. v. Stentor Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) that a federal court must follow the choice of law rule of the state where it sits, still prevails. In the instant case this rule would mean that this court would follow the choice of law rule of the State of Texas.

Although the Supreme Court has not seized upon the *Byrd* or *Hanna* dicta to free any of the binding ties of Klaxon Co. v. Stentor Mfg. Co., Inc., *supra*, a few circuit court decisions have used the "countervailing considerations" argument to steer away from Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In Brown v. Pyle, 310 F.2d 95, 97 (5th Cir. 1962), the Fifth Circuit rejected an argument that despite improper venue, a federal court must hear a case if a state court would. In Monarch Ins. Co. of Ohio v. Spach, 281 F.2d 401, 406–407 (5th Cir. 1960) the court said a federal court may admit a pretrial examination in evidence even though a state court would not.

■ Defendant, Mobil Oil, strongly urges that Libyan substantive law is the only applicable law. It must be assumed that Mobil urges this approach because it claims that to follow *Klaxon, supra*, this court would be forced under the holding of Bernhardt v. Polygraphic, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956) to adopt the *lex loci delictus* theory of Marmon v. Mustang Aviation, Inc., 430 S.W.2d 182, 184 (Tex.1968) [the Supreme Court of Texas has not made any changes in this area since *Marmon, see* Doss v. Apache Power Co., 430 F.2d 1317 (5th Cir. 1970)]. But *Marmon, supra*, was a wrongful death case involving a detailed statutory interpretation of Tex.Rev.Civ.Stat.Ann. art. 4678 which is not at issue in the present case. Thus it is not applicable to a personal injury case not resulting in death where the accident in question occurred in a foreign country. Tex.Rev.Civ.Stat. Ann. art. 4678 is not applicable because, as stated in the introductory paragraph to the entire Title 77 of the statute, the act was intended to encompass only "injuries causing the death of any person." (emphasis added). To try to apply *Bernhardt, supra*, any further would simply mean that a federal court in Texas is to determine what the Texas state courts would think the Libyan courts would think on an issue about which neither has thought and merely highlights the unreality of the process. C. A. Wright, Federal Courts 235 (2nd 3d 1970).

Libyan law would require reparation by any defendant who causes injury to another.

"Every fault (i. e. indicated by Code headings to mean unlawful personal act) which causes injury to another

imposes upon the person by whom it is committed an obligation (legal duty) to make reparation." Libyan Civil Code, Article 166.

The Libyan law reflects its direct descendancy from civil law in its judicial handling of the substantive law of damages. Libya does not have a jury system. Determinations on damages by the trial judge, apportionment, and certain other features of the Libyan system for dealing with damages are similar to certain federal trial practices.

The Libyan law on contributory negligence is easily implemented by the judge's power to closely control the award of damages. The judge denies or diminishes damages if the plaintiff's fault or negligence caused or contributed to the plaintiff's injury.

"The Judge may reduce the amount of damages if the creditor (judgment creditor or plaintiff or obligee), by his own fault has contributed to the cause of, or increased, the loss." Civil Code Article 219.

Article 168 of the Libyan Civil Code allows the judge to deny any recovery to a plaintiff if the defendant proves that the injury resulted from a "cause beyond his control, such as * * * the fault of the victim (plaintiff) or of a third party."

Under Article 172 of the Civil Code it is provided that the judge may apportion damages among several persons responsible for them.

With the exclusion of the specific references to contributory negligence, the general tenor of the Libyan code giving a judge great discretion in setting an award of damages is very similar to the legislative philosophy noted in the federal system where a judge is given broad powers of discretion and comment. American jurisprudence has long recognized the wisdom of the power of remittitur exercised by judges to facilitate the carriage of justice.

The plaintiff urges that the law of California is the appropriate law to be applied to the instant case. This allegation is based on the theory that in the Contract For Construction and Related Services Between Mobil Oil Libya, Ltd. and Arabian Bechtel Corporation at page 5 ["other benefits"] (plaintiff's Exhibit No. 13) the parties incorporated as Exhibit "A" to that contract Bechtel's "Personnel Procedure Arabian Bechtel Corporation." Furthermore, attached as a part of the Personnel Procedure is a copy of Bechtel Corporation's Memorandum of Agreement and Employment Agreement signed by each employee, including plaintiff Couch. At page 5 of the Bechtel Employment Agreement it states that the exclusive remedy for injuries received is the California Workmen's Compensation Insurance Laws. The plaintiff's argument continues that if Mobil has signed the construction contract with Bechtel which incorporates the Bechtel Employment Agreement, then Mobil has also agreed as a third party beneficiary to the Bechtel Employment Agreement to litigate any injury claim under the California laws.

Since Mobil is the primary contractor in the present case and the subcontractor, Bechtel, is the employer of the plaintiff, California Workmen Compensation laws would allow plaintiff to sue Mobil directly. The California law of conflicts would employ an interest analysis criteria to choose which law would apply. *Bernkrant v. Fowler*, 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961); *Contra Victor v. Sperry*, 163 Cal.App.2d 518, 329 P.2d 728 (4th Dist. 1958).

California has been in the forefront of trailblazers for the governmental interest test. Beginning with *Emery v. Emery*, 45 Cal.2d 421, 289 P.2d 218 (1955), Justice Traynor ably discerned the wisdom of abandoning the rote First Restatement of Conflicts approach. This new route was again used in *Grant v. McAuliffe*, 41 Cal.2d 859, 264 P.2d 944 (1953), where a Traynor decision allowed the claim of a California decedent despite the fact that the place of injury, Arizona, would have abated. The decision rested, unfortunately, on a procedural characterization, but the basis for

the *outcome was rooted in the interest analysis of what state's policies should prevail.*

The governmental interest test, or interest analysis, is premised on the logical theory that choice of law rules are useful only as shorthand expressions of a policy-centered analysis. When the problem is viewed in this light there is only a spurious conflict or false conflict on the issue of primary liability in this case. This is because any state law of possible applicability to the problem has the statutory or common law policy of providing recovery for one injured by the tortious conduct of another. However, the issues of contributory negligence, comparative negligence, and the issue of whether a plaintiff as an employee is responsible for the lack of due care by his employer, the subcontractor, present true conflicts. The policy behind the California and Texas contributory negligence theories *is to give a complete bar to the plaintiff's recovery if he, in any way, contributed to the harm inflicted on him.* On the other hand the Libyan theory is to weigh the relative impact of each action and to distribute the burden of reparation accordingly. The Law of Libya, Commercial Code Article 136, also placed on Bechtel, through its responsible employees, the legal duty of "supervision at its own risk" in carrying out the work contract. This Libyan public policy is apparently contrary to the public policy of Texas, namely, that the antiquated doctrine of *volenti non fit injuria* is applicable *only* between employer (not a third party) and employee. Wood v. Kane Boiler, 150 Tex. 191, 238 S.W.2d 172 (1951).

The only relevant interest that Libya really has at stake in this suit is to see that tortious conduct is not encouraged in her jurisdiction; consequently, to employ Libyan law only on this basis, in a nonintentional tort, would be an inordinately weak rationale. Any interest Libya has in protecting the defendant corporation from exorbitant judgments would even be furthered by American law where *any* contributory negligence would bar a plaintiff's recovery.

■ The California law of conflicts would apparently continue its analysis by reviewing the relevant contacts with the possible state or country's laws that might be applicable. The adoption of this type of "grouping of contacts" approach is one that does not adequately take into consideration the policies behind the laws in conflict. Yet, many courts have and will probably continue to fall unwittingly into this pattern because the Second Restatement of Conflicts seems, in all its verbosity, to condone this method. *See* Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954); Bernkrant v. Fowler, *supra* (an oral will case). Under this phase of analysis, the various contacts of the parties with the possible states or countries whose laws could be used must be noted.

Mobil Oil Libya, Ltd. is a wholly-owned subsidiary of Mobil Oil Corporation and is a part of the international division of Mobil Oil Corporation. Mobil is a duly organized corporation under New York law doing business in Texas. Mobil Oil Libya, Ltd. is incorporated under the laws of Panama and operates in Libya. The plaintiff was a resident of Texas before the accident in Libya and has been hospitalized and receiving treatment in Texas since the accident. The plaintiff was hired by the subcontractor and departed for Libya from Texas. If the plaintiff does not recover he will be a charge of the State of Texas, not Libya. Texas apparently has more relevant contacts with the parties than any other jurisdiction, and California would therefore apply Texas substantive law.

If Libyan law were not used it would not offend the due process clause of the United States Constitution because neither plaintiff nor defendant would be unduly surprised. Home Ins. v. Dick, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930). That case holds that surprise is only found if the defendant at the time of the act could not reasonably have foreseen that his conduct might create

a contact with another state. There is no surprise in the instant case because neither party expected to use Libyan law. Couch contracted with Bechtel to apply California law in case of injury and Mobil contracted with Bechtel to settle any direct suit with Bechtel in the New York courts. *But see* Aetna Life Ins. Co. v. Dunken, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924). Both parties could reasonably foresee the contacts with Texas and California.

In not applying the Libyan law on "supervision at its (plaintiff's) own risks," the constitutional test applied in Pacific Empl. Ins. v. Ind. Acc't. Comm., 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940 (1939) is met. In that case Mr. Justice Stone read the "obnoxiousness" test into the precedent of Bradford Elec. Light Co. v. Clapper, 286 U.S. 145, 52 S.Ct. 571, 76 L.Ed. 1026 (1932). That is to say, if another state's law is so obnoxious to the public policy of the state where the court is sitting then that court should not apply the other state's law. *See* Carroll v. Lanza, 349 U.S. 408, 413, 75 S.Ct. 804, 99 L.Ed. 1183 (1955). The Libyan theory of holding an employee liable for his employer's lack of supervision would be obnoxious to Texas public policy by denying recovery against a primary contractor.

In the interest of effective justice, this court should not apply Libyan law, for the complexities of interpretating the laws of a country that is in political upheaval and unrest is tenuous at best. The efficient aids of F.R.Civ.P. 44.1 are of little assistance in such a case. Yet, the disposition of Slater v. Mexican Nat'l R., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900 (1904) is not applicable in this case, for that was a death action where the Texas parties were only across a bridge from the Mexican courts and could easily and readily try their case there. Also, that case rested its liability on a criminal act or penal code violation as declared by the laws of Mexico where the death occurred. It is undoubtedly valid to use foreign law and try a person in the foreign jurisdiction where a criminal act

occurred. Thus, if it would amount to prosecuting the defendant for a crime which was committed in another jurisdiction, the forum court should dismiss.

But if, as in the case at bar, there is no rational basis for preferring one conflicting policy or law over the other, a court should weigh the desirability of giving absolute preference to the forum policy and law against the desirability of insulating the result from the selection of the forum (i. e., forum-shopping). The new A.L.I. proposals adopt such an approach in their multi-party-state provision:

"Whenever State law supplies the rule of decision on an issue, the district court may make its own determination as to which State rule of decision is applicable." A.L.I. Study of the Division of Jurisdiction Between State and Federal Courts § 2374(c) (May 1968).

In a case based on an identical fact situation, the Second Circuit handed down a decision which they themselves termed unjust. The case turned on the procedural point of proving the exact foreign law. In placing that burden on the plaintiff, the court by way of dicta outlined some policy considerations that bear heavily on this case:

"This conclusion seems unjust for this reason: Both the parties are Americans. The plaintiff was but a transient in Saudi Arabia when the accident occurred and has not been there since that time." Walton v. Arabian Am. Oil Co., 233 F.2d 541 (2nd Cir. 1956).

This type of heavy emphasis on the nationality of the parties has recently been employed by the Fifth Circuit in sustaining an American Court's jurisdiction in an admiralty case where both parties contracted to litigate in the English courts. There the court also spoke to the Slater v. Mexican Nat'l R., *supra*, dismissal problem:

"It was within the sound discretion of the district court to decline jurisdiction on the basis of forum non conveniens. But apart from the forum

selection clause itself the circumstances supported a retention and determination by the district court. Though the towage contract envisioned a long voyage with potential exposure to the jurisdiction of numerous states, the flotilla never escaped the Fifth Circuit's mare nostrum, and the casualty occurred in close proximity to the district court. A considerable number of potential witnesses, including Zapata's crewmen who were aboard the Chaparral, reside in the gulf coast area of the United States. Preparations for the voyage were made in this area, and, after the casualty, inspection of the damage and repair work was conducted there. The testimony of Bremen's crewmen, residing in Germany, is available by way of depositions already taken in the proceedings. The only other nation having significant contacts with, or interest in, the controversy is Germany. England's only relationship is the designation of her courts in the forum clause.

"Zapata, the only claimant in the limitation action, is a United States citizen. The discretion of the district court to. remand the case to a foreign forum was consequently limited. This is especially true since, as the court noted, there are indications that Zapata's substantive rights will be materially affected if the dispute is litigated in an English court. The towage contract contained the following exculpatory provisions: ·

"1. * * * Urag [Unterweser], their masters and crews, are not responsible for defaults and/or errors in the navigation of the tow.

"2. (b) Damages suffered by the towed object [Chaparral] are in any case for account of its owners.

"These provisions are apparently contrary to public policy and unenforceable in American courts. However, according to the affidavit of F. D. Bateson, Zapata's English maritime law expert, these clauses would be held prima facie valid and enforceable by an English court. The district court was entitled to consider that remanding Zapata to a foreign forum, with no practical contact with the controversy, could raise a bar to recovery by a United States citizen which its own convenient courts would not countenance.

"Moreover, it is doubtful that Unterweser would benefit even if we ignored Carbon Black [Carbon Black Export, Inc. v. The SS Monrosa, 5 Cir., 254 F.2d 297] and somehow resurrected the Muller [Wm. H. Muller & Co. v. Swedish American Line, Ltd., 2 Cir., 224 F.2d 806] rule. The minority of jurisdictions which recognize forum selection provisions, as prima facie valid, deny enforcement where the clause is shown to be unreasonable. One commentator, advocating this position, elaborated on the question of reasonableness:

"[E]ffect should be denied the clause if there is reason to believe that the courts of the selected state would deal unfairly with the plaintiff or would deny him relief to which he was entitled,

\* \* \* \* \* \*

"Likewise, effect should be denied the clause if the selected state is a seriously inconvenient one for the trial of the action, as might be true in a situation where the occurrence sued upon took place in a distant place from which, if the trial were to be held in the selected state, it would be necessary to transport large numbers of witnesses.

"On the facts of the present case the district court did not choose to disturb the original choice of forum. We do not feel it abused its discretion in this regard." In Re Unterweser Reederei, GMBH v. Bremen, 428 F.2d 888 (5th Cir. 1970) (en banc hearing granted).

Upon a review of the facts of the instant case, it would be a denial of justice to close the doors of this court to an American plaintiff suing an American company, and require him to travel half

way around the world to find a forum. The witnesses needed in the trial of this case are available in Texas or their depositions have already been taken. Consequently, this court is a proper and convenient forum.

With all the relevant Texas contacts of both the plaintiff and defendant and due to the difficulty of applying Libyan law in a jury case as well as the inherent conflict of public policy on particular issues (see above *volenti non fit injuria*), it would seem more appropriate to apply Texas law, which this court will do, thereby adopting the interest analysis test in this thorny field of conflicts of law.

Accordingly, Texas tort law will be applied in this case tried before a jury impanelled under the F.R.Civ.P. 38, 39.