Hawley K. CHALLONER et al., etc.,
Plaintiffs-Appellees,

v.

DAY AND ZIMMERMANN, INC., et
al., Defendants-Appellants.

No. 74–1555.

United States Court of Appeals,
Fifth Circuit.

April 24, 1975.

Rehearing Denied June 2, 1975.

Norman C. Russell, Texarkana, Tex., for defendants-appellants.

Cahill Hitt, Texarkana, Tex., for plaintiffs-appellees.

Before BROWN, Chief Judge, and COLEMAN and DYER, Circuit Judges.

COLEMAN, Circuit Judge.

The premature explosion of an 105 mm. howitzer round in Cambodia, May 22, 1970, while the Armed Forces of the United States were engaged in combat with the North Vietnamese, prompted this diversity suit. Hawley K. Challoner, of Wisconsin, was seriously injured by the explosion. Daniel E. Nelms, of Tennessee, was killed. Suit was grounded upon strict liability principles enunciated by Texas law. There was a jury verdict of $200,000 for Challoner, and a $40,000 award for Nelms' administrator against Day and Zimmermann. The defendant had manufactured the artillery round in Texas. The difficulties of the case are quickly recognized, but we affirm the judgment of the District Court.

Day and Zimmermann is incorporated in Maryland and has its principal place of business in Pennsylvania.

Under Texas law the plaintiffs had the burden of establishing by a preponderance of the credible evidence that a defect in the ammunition was the cause of the premature explosion.

Plaintiffs produced a number of witnesses. The direct evidence was supplied by James Schrader, for twenty-eight

years an ammunition control specialist for the Army. Schrader testified that the most likely cause of the premature explosion was the existence of cavitation in the explosive material Composition B poured into the artillery round by Day and Zimmermann. This cavitation, said Schrader, resulted in explosion inducing collapse of the Composition B before it had reached the end of the gun tube.

Schrader's testimony was buttressed by the testimony of an Army Major who investigated the accident. The Major's opinion was that the explosion was the result of an ammunition malfunction.

Various gun crew members testified that all safety procedures had been followed, which tended to eliminate causes other than ammunition defects, thus corroborating Schrader.

Finally, plaintiffs introduced United States Government reports of tests of ammunition taken from the same lot as the round which had exploded. These reports showed that some of the tested rounds had cavities in the explosive material.

Defendants countered with expert testimony that the defects turned up by the government tests were insufficient to cause a premature explosion. An agent of Day and Zimmermann testified that defendants made the ammunition precisely in accordance with government design; it had fully followed the government approved inspection system designed to uncover any defects. An agent of the United States testified that government inspectors rigidly monitored Day and Zimmermann to assure that the government approved designs and specifications were followed.

The District Judge held that the strict liability principles of Texas law governed and submitted the case to a jury.

The assigned errors may be topically considered as follows:

## I

### Was the District Court Correct in Applying Texas Substantive Law?

Defendants argue that the District Court erred in applying the substantive law of Texas. It says that under the decisions in Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and Klaxon v. Stentor Electric Manufacturing Company, Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the conflict of law rules of the Texas forum must be applied, and that under Texas conflict of law rules, the law of Cambodia, the place of the injury, governs.

It is not to be denied that the much discussed decision[1] in Klaxon, supra, held, as a general rule, that the conflict of laws rules of the forum applies in a diversity case. The Klaxon Court was "of opinion that the prohibition declared in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, against such independent determinations by the federal courts extends to the field of conflict of laws. The conflict of laws rules to be applied by the federal court . . . must conform to those prevailing in . . . state courts. Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side". 313 U.S. at 496, 61 S.Ct. at 1021.

This would mean that, applying Texas choice of law rules, certainly as to the wrongful death, Marmon v. Mustang Aviation, Inc., 430 S.W.2d 182 (Tex., 1968), and Click v. Thuron Industries, Inc., 475 S.W.2d 715 (Tex., 1972), and perhaps as to the personal injury, compare Marmon, supra, and Click, supra,

---

1. See e. g., Wright, Law of Federal Courts, § 57, p. 236; Horowitz, Toward: A Federal Common Law of Choice of Law, 14 U.C.L.A. Law Review 1190; and Hart, "The Relations between State and Federal Law", 54 Columbia Law Review at 514. Hart summarizes the case against Klaxon in the following language:

[Choice of law questions] are essentially federal, in the sense that they involve, by hypothesis, more than one state. To the solution of no other type of controversy is the diversity jurisdiction better adapted.

with Couch v. Mobile Oil Corporation, D.C., 327 F.Supp. 897 (1971), and Continental Oil Company v. Lane Wood & Company, 443 S.W.2d 698 (Tex., 1969), the substantive law of Cambodia would control.

For a number of reasons, however, we hold to the contrary. First, there is our decision in Lester v. Aetna Life Insurance Company, 5 Cir., 1970, 433 F.2d 884, cert. denied 402 U.S. 909, 91 S.Ct. 1382, 28 L.Ed.2d 650. *Lester* was a diversity action on a life insurance policy. Plaintiff-beneficiary was a Louisiana citizen; defendant insurer was a Connecticut insurance company which did business in Wisconsin and which had issued the policy in Wisconsin. The action was begun in Louisiana state court and removed to federal court.

The insurer's defense was that the policy had been cancelled. Plaintiff claimed the cancellation was ineffective because it was not preceded, as required by Louisiana law, by written notice that premiums were due. Defendant relied on Wisconsin law which required no notice. The issue was whether Louisiana or Wisconsin law governed.

We refused to look to the Louisiana conflict of law rule, deciding that as a matter of federal choice of law, *we could not apply the law of a jurisdiction that had no interest in the case*, no policy at stake. The Wisconsin law was designed for the protection of Wisconsin insurers. Defendant was not a Wisconsin insurer; thus, Wisconsin had no interest in the case. On the other hand, since a Louisiana citizen was the insured party, the Louisiana policy of protecting insured parties by requiring notice was at stake. As the arbiter of relations between the states, we deemed it wholly inappropriate to apply any law other than the law of the only jurisdiction that had any real interest in the contest.

The *Lester* principle controls here. Like Wisconsin in *Lester*, Cambodia has no interest in this dispute between American litigants. The Cambodian requirement that fault be proved is a policy designed to afford a high degree of protection for Cambodian manufacturers; Cambodia is indifferent to the protection of American manufacturers.

On the other hand, it might be said that Wisconsin, Tennessee, Pennsylvania, and Texas all have a substantial interest in this case. Wisconsin, Challoner's domicile, and Tennessee, Nelms' domicile, are strict liability states, Ford Motor Company v. Lonon, 217 Tenn. 400, 398 S.W.2d 240 (1965); Howes v. Hansen, 56 Wis.2d 247, 201 N.W.2d 825 (1972). The policy of these states is to provide maximum protection for their injured citizens. Wisconsin and Tennessee citizens are the injured parties. The Wisconsin and Tennessee policy of affording maximum protection to their injured citizens will be carried out by Texas law since Texas is also a strict liability state, Darryl v. Ford Motor Company, 440 S.W.2d 630 (Tex., 1969).

Pennsylvania, the state where defendant has its principal place of business, like Texas, is a strict liability state, Hoffman v. A. B. Chance Company, 346 F.Supp. 991 (M.D.Pa., 1972). The strict liability policy of both Pennsylvania and Texas is designed in part to require a high standard of care of their manufacturers—a policy which would be frustrated by the application of Cambodian law. Thus, application of Texas law will promote the interests of Wisconsin, Tennessee, Pennsylvania, and Texas, while having no effect on the interests of Cambodia which is concerned only with financial protection for Cambodian manufacturers.[2]

■ In short, these facts fit squarely within the *Lester* principle. This is a

---

**2.** Since a member of the United States Armed Services is involved in this case, the United States also has an interest. However, since "there is no general federal common law", Erie v. Tompkins, *supra*, we are unable to say with any substantial degree of certainty what the United States policy is regarding compensation of injured servicemen. We believe, however, that the people of the United States would not desire that their servicemen be subjected to less stringent standards of care than are provided by their own home states.

case in which the policies of all jurisdictions having an interest in the dispute will be carried out through application of Texas law. No jurisdiction will have any policy frustrated by application of that law. In such a situation, *Lester* dictates that as a matter of federal choice of law, we apply the law of the jurisdictions having a legitimate interest in the contest, any state conflict of law rule to the contrary notwithstanding. However controlling state law may be in most diversity cases, it does not extend so far as to bind a federal court to the law of a wholly disinterested jurisdiction.[3]

In addition to the holding in *Lester*, we find other compelling reasons for not allowing Texas conflict of law rules to dictate a resort to Cambodian law. One such reason is that the rationale for application of the traditional (place of the injury) conflict rule applied by Texas courts is not operative under the present facts. The traditional conflict rule is grounded upon the premise that sovereign powers have the exclusive authority to determine rights and liabilities arising out of transactions occurring within their borders. As explained by Mr. Justice Story:

I. The first and most general maxim or proposition [of conflict of law] is that . . . every nation possesses an exclusive sovereignty and jurisdiction within its own territory. The direct consequence of this rule is that the laws of every state affect, and bind . . . all persons, who are resident within it, whether natural born subjects, or aliens; and also all . . . acts done within it.

\* \* \* \* \* \*

II. Another maxim, or proposition, is, that no state or nation can, by its laws, directly affect, or bind . . . persons not resident therein, whether they are natural born subjects, or others. This is a natural consequence of the first proposition; for it would be wholly incompatible with the equality and exclusiveness of the sovereignty of all nations, that any one nation should be at liberty to regulate persons . . . not within its own territory.

Story, Commentaries on the Conflict of Laws, 2d ed., 1841.

■ Under familiar principles of international law, the place of the injury, in this case Cambodia, had no authority to govern the persons or transactions involved in this law suit. As put by Chief Justice Marshall, "A [nation] is understood to cede a portion of [her] territorial jurisdiction where [she] allows the troops of a foreign nation to pass through [her] dominio ", The Schooner Exchange v. M'Fadde , 7 Cranch 116, 139, 3 L.Ed. 287 (1812).

■ Thus, the only imaginable reason for applying Cambodian substantive law—the right of a sovereign to govern transactions within its borders—evaporates. Cambodia, under established principles of international law has no right to determine rights or liabilities as between foreign subjects arising out of the military activities of a foreign power.

---

**3.** The United States Supreme Court has recognized that not every diversity case will be governed, in all its aspects, by state law. For example, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) was a diversity case in which a primary issue was whether recognition should be given petitioner's title in sugar—title which had been gained through the Cuban government's expropriation from a former owner. The court held the question should be resolved by federal law, citing with approval Professor Jessup's warning of this danger implicit in allowing states to decide questions affecting national relations.

In Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), civilian labor union leaders claimed an American military officer had defamed them and, invoking diversity jurisdiction, sued for libel. The officer claimed that since his statements were made in the course of his military duties, it was privileged. The Supreme Court held, inter alia, that despite the fact that the action was founded on state law and despite the fact that diversity of citizenship was the basis of jurisdiction, the validity of the defense was to be judged by federal standards.

A third and final reason for not applying Cambodian law lies in the very nature of this Court. We are a Court of the United States, an instrumentality created to effectuate the laws and policies of the United States. We conclude that in this case we have no warrant, legal or moral, to frustrate well established American policies by an application of the local policies of a foreign government.

The District Court was correct in applying Texas substantive law.

The remaining inquiry, then, is whether Texas law was correctly applied.

## II

### In Texas, Can Non-Sellers Be Held Strictly Liable?

■ Defendants direct our attention to the fact that by its literal terms Restatement § 402(a) refers only to *sellers*. Under their contract with the government, defendants sold nothing. They simply assembled materials purchased by the government. Never having had title to the goods, they were not a seller; hence, defendants say that the principles of strict liability are inapplicable.

While defendants are quite correct in their observation that the express term of Restatement § 402(a) refers only to sellers, the Texas courts have been more liberal, not requiring a literal sale for the attachment of strict liability. Rather, strict liability attaches whenever "the transaction by which a product is transmitted into the stream of commerce is 'essentially commercial' in character", Rourke v. Garza, 511 S.W.2d 331, 336 (Tex.Civ.App.1974); McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex. 1967); Freitas v. Twin City Fisherman's Cooperative Association, 452 S.W.2d 931 (Tex.Civ.App.1970).

The ammunition in this case came into commerce via a commercial transaction, here, a "cost plus" contract. This is all that is necessary for the attachment of strict liability under Texas law.

## III

### Was There Error in Instructing The Jury That it Could Find Defendants Liable if Product was Defectively Designed?

■ Defendants claim there was reversible error in giving the following instruction:

"You are further instructed that a defect in any product can arise from one or two different origins. The first such form of defect is one that arises due to some miscarriage in the production or assembly process so that the product is not produced as it had been planned. An example of a defective product of this type is one which contained a foreign substance or has unintended features. The other form of such defect is one that results from the design of a given product. An example of the defective product of this type is one that was used exactly as designed and intended and yet still was in a defective condition that was unreasonably dangerous to cause of the design. Should you find from a preponderance of the evidence that a defect, if any, in the said 105 Howitzer shell was in a sealed component part of the shell you may infer that such condition existed at the time it was sold."

This instruction might indicate that the jury should find defendants liable if it found the product was defectively designed. This, defendants say, the jury was not entitled to do since design was exclusively within the control of the government. Numerous cases are cited which have held that a contractor is not liable for injuries caused by the defective design furnished him by another unless the design is so glaringly or obviously dangerous that the contractor should have been alerted. See, e. g., Ryan v. Feeney & Sheehan Building Company, 239 N.Y. 43, 145 N.E. 321, 41 A.L.R. 1 (1924), and Davis v. Henderlong Lumber Company, 221 F.Supp. 129 (N.D.Ind., 1963).

■ The difficulty with this argument is that the cited cases which absolve defendants who follow defective designs of another were not decided under a strict liability theory. They involved attempts to demonstrate negligence and stand only for the proposition that there is no negligence in following the design of another unless the design is such that the defectiveness was sufficiently obvious to alert a reasonably competent technician to the danger.

■ In this case, it was not necessary to prove negligence. The theory alleged is strict liability. A strict liability case, unlike a negligence case, does not require that the defendant's act or omission be the cause of the defect. It is only necessary that the product be defective when it leaves the defendant's control. A specific example of this principle is found in Comment (f) to Restatement § 402(a) which says that strict liability applies to "wholesalers, retailers, or distributors" who sell defective products, notwithstanding the fact that these parties will not normally be the ones who caused the existence of the defect. Texas cases which have held principles of strict liability to attach even though defendant was not the party who caused the existence of the defect are McKisson v. Sales Affiliates, 416 S.W.2d 787 (Tex. 1967), and Sharp v. Chrysler Corporation, 432 S.W.2d 131 (Tex.Civ.App., 1968), holding dealer strictly liable for defect in automobile.

## IV

### Was There Sufficient Evidence To Allow the Jury to Conclude That the Round was Defective When It Left Defendants' Hands?

■ Defendants contend the evidence was insufficient to allow the jury to conclude that the shell was defective. This argument is weighed by the standards we set forth in Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841, 850, which held that a jury's verdict must be upheld "if there is a rational basis in the record" for it.

A rational basis for the jury's verdict in this case was provided by the testimony of plaintiffs' expert James C. Schrader who said that the most probable cause of the explosion was cavitation in the Composition B material that defendant poured into the projectile. Schrader's testimony was buttressed by the testimony of various soldiers who swore that all required safety procedures had been followed. Such testimony could justify the elimination of the probability that user neglect caused the premature explosion. Similar circumstantial evidence was held sufficient to support a jury's verdict in Franks v. National Dairy Products Corporation, 5 Cir., 1969, 414 F.2d 682.

## V

### Did the Trial Judge Err In Admitting United States Government Reports of Shell Tests?

Following the explosion, the government tested artillery shells drawn from the same lot as the shell which prematurely exploded. These tests showed that a number of the shells had cavities in the explosive material, leaving the jury an opportunity to infer that the shell in question was likely to have had similar cavities.

■ Defendants argue that the reports were inadmissible hearsay. We do not agree that they were inadmissible. Dallas County v. Commercial Union Assurance Company, 5 Cir., 1961, 286 F.2d 388, held that a federal district court is entitled to admit evidence inadmissible under state law if that evidence is trustworthy and of probative value. Only an abuse of discretion will require reversal.

■ Here, the evidence was gathered by the government, which had as its sole incentive the determination of whether the shells were, in fact, defective. This assured a high degree of trustworthiness. The fact that other shells in the lot had cavities in the explosive material was relevant since it increases the probability that the shell in question had a similar deficiency. Thus, this evidence was both trustworthy and relevant. The trial

84

judge did not abuse his discretion in admitting it.

## VI

*Should We Refuse To Apply The Principles of Strict Liability On A Public Policy Basis?*

■ Finally, defendants note that many of the justifications for the adoption of strict liability are not present in this case. For example, defendants argue that this is not a case in which plaintiffs acted in reliance on advertisements or warranties, and is not a case in which strict liability will induce greater care since defendants' procedures are government controlled. In one respect, defendants are no doubt correct; not all of the reasons that have justified the move to strict liability are present here. However, the most basic and primary justification for imposing strict liability is present. "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves", Foster v. Day & Zimmermann, Inc., 8 Cir., 1974, 502 F.2d 867, 871, quoting Hawkeye-Security Insurance Company v. Ford Motor Company, 174 N.W.2d 672 (Iowa, 1970), which takes the quote from the leading strict liability case of Greenbaum v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 700, 377 P.2d 897, 900 (1963).

We therefore agree with the Eighth Circuit's rejection of the defendants' public policy argument.

"In making the grenade and its component parts the defendants knew that it was made for military personnel and that it was to be used by them. We believe the public interest in human life and health requires the protection of the law against the manufacture of defective explosives, whether they are to be used by members of the public at large or members of the public serving in our armed forces."

Foster v. Day & Zimmermann, Inc., 8 Cir., 1974, 502 F.2d at 871.

In upholding the recovery for wrongful death we are not unmindful of the decision of this Court in Ramirez v. Autobuses Blancos Flecha Roja, 5 Cir., 1973, 486 F.2d 493. In that case a Mexican national, in Texas, bought a bus ticket from a Mexican corporation for transportation from Laredo to Saltillo. In Mexico, while enroute to Saltillo, there was a collision in which the passenger was killed. Texas, of course, had nothing to do with the collision. Citing Marmon v. Mustang Aviation, Inc., 430 S.W.2d 182 (Tex., 1968) we held, in effect, that the Texas wrongful death statute has no extra-territorial effect. In *Marmon* it had been held that the law of Colorado, where the deaths occurred, provided the appropriate remedy. Those deaths, however, were caused by pilot error, something Texas had absolutely nothing to do with.

We said that "the Texas Wrongful Death Act as recently and authoritatively construed is not an available remedy where the injury causing death did not occur on Texas soil".

Nevertheless, in a highly vital respect the present appeal is not like *Marmon*: the wrongful act, i. e. the defective loading of the shell, occurred in Texas. Thus Texas had the same intimate connection with the death here in question as if a defendant standing in Texas had killed a man by firing a rifle across the state line. Additionally, as already pointed out, the direct culmination of the defective manufacture occurred not in some other state of the American Union, as in *Marmon*, but on foreign soil in which the foreign government had no jurisdiction over what was taking place. In our considered judgment, then, the Supreme Court of Texas, if it had this appeal, would hold that conventional notions of extra-territoriality do not encompass the peculiar situation we have here and would further hold that the Texas Legis-

lature had in mind no such an extra-territorial limitation when it enacted the Wrongful Death Statute.

The judgment of the District Court is Affirmed.