Ada G. JOHNSTON, Individually and as Heir-At-Law of Earl E. Johnston, Deceased, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Barbara J. WOMACK and Loyd B. Womack, Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Estella I. VESSELS, Individually and as Heir-At-Law of Don C. Vessels, Deceased, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Lila M. MEWHINNEY and Richard M. Mewhinney, Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Nos. 81–1060, 81–1061, 81–1100 and 81–1101.

United States District Court, D. Kansas.

July 18, 1983.

---

See also, D.C., 546 F.Supp. 879.

Ken M. Peterson of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for plaintiff.

Donald Patterson and Steve Fabert of Fisher, Patterson, Sayler & Smith, Topeka, Kan., for defendants General Motors and Lewis Engineering.

## MEMORANDUM AND ORDER

KELLY, District Judge.

These lawsuits stem from cancer or leukemia that was contracted by four former employees of Aircraft Instrument and Development, Inc. (AID), a concern whose business is the repair and overhaul of aircraft instruments. Plaintiffs contend that these four cases of cancer were caused by exposure to ionizing radiation that originated in luminous radioactive compounds on the faces of many instruments sent to AID for overhaul; they assert various tort claims against the United States, for whom some of the instruments were made, against eight defendants who manufactured the instruments, and against 15 defendants who sent the instruments to AID.

These cases are now before the Court on motions for summary judgment filed by two of the manufacturer-defendants, General Motors Corporation (GM) and Lewis Engineering Company (Lewis). GM and Lewis argue that any of their instruments which reached the AID plant were produced under wartime contracts with the United States, and that the supposed injury-causing aspects of the instruments were all mandated by contract specifications; these facts, they claim, absolve them of any liability for plaintiffs' injuries. GM and Lewis also argue that under the facts of this case they had no duty to warn of the dangerous, radioactive condition of the instrument dials, and that they thus cannot be held liable for a "breach" of that ostensible but nonexistent duty. As explained more fully below, there is at least a substantial dispute as to whether the dangerous aspects of these instruments were mandated by contract specifications; moreover, even on defendants' version of the facts the Court doubts that the so-called "government contract defense" on which GM and Lewis rely has any application to this case. By the same token, defendants have not shown beyond factual doubt that the risk of harm to the injured AID workers—or others similarly situated—was so small or unforeseeable that no duty to warn of that risk was triggered. Defendants' motions for summary judgment must therefore be denied.

The so-called "government contract defense" at issue in such recent cases as *In re Agent Orange Products Liability Litigation,* 506 F.Supp. 762 (E.D.N.Y.1980) and 534 F.Supp. 1046 (E.D.N.Y.1982), is in reality an amalgam of two separate defenses that are based on separate principles and applicable in two ranges of distinct but overlapping factual situations. These two defenses will be referred to here as the "contract specification defense" and the

"government contract defense." *See* Note, *Liability of a Manufacturer for Products Defectively Designed by the Government,* 23 B.C.L.Rev. 1025, 1031–32 (1982). The contract specification defense applies to products manufactured to the order and specification of another, whether that other be the government or a private party. Under this defense, which is based on ordinary negligence principles, a contractor is not liable for damages resulting from specifications provided by his employer unless those specifications are so defective and dangerous that a reasonably competent contractor "would realize that there was a grave chance that his product would be dangerously unsafe." Restatement (Second) of Torts § 404 comment a. (1965); *see also id.* § 389 comment e., illustration 1; *Challoner v. Day and Zimmermann Inc.,* 512 F.2d 77, 83 (5th Cir.1975), *vacated and remanded on choice of law grounds,* 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Lenherr v. NRM Corp.,* 504 F.Supp. 165 (D.Kan.1980). In essence, the defense is based on the presumption that a contractor will lack the expertise to evaluate the specifications given him—just as a nurse or orderly will seldom be in a position to second guess a physician—and is thus not held to the same high standard of care as is a designer. *See, e.g.,* Note, *supra,* 23 B.C.L.Rev. at 1034–35; *Person v. Cauldwell-Wingate Co.,* 187 F.2d 832 (2nd Cir.1951) (Learned Hand, J.), *cert. denied* 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951). This does not mean, however, that as long as the designer gets what he asks for the manufacturer bears no responsibility: indeed, in those unexpected cases where the manufacturer has special knowledge or expertise, he may be held to as high a standard of care as the designer—or higher. *See id.;* Restatement (Second) of Torts § 289(b) & comment m. In short, the contract specification applies when—and only when—the contractor is not negligent.

■ A necessary corollary of the fact that the contract specification defense has

its source in ordinary negligence principles is that it does not apply to actions grounded in strict liability. *Challoner, supra; Lenherr, supra.* At first glance it may seem harsh to hold a manufacturer responsible for a defect in someone else's design, but surely no harsher to hold a retailer or wholesaler responsible for a nonobvious manufacturing defect, *see* Restatement (Second) of Torts § 402 comment f.: if the loss spreading rationale that is "the most basic and primary justification for imposing strict liability," *Challoner, supra,* 512 F.2d at 84, suffices to hold the "innocent" wholesaler liable in the latter instance, it should suffice to hold the "innocent" manufacturer liable in the former. *See also* Westerbeke & Meltzer, *Comparative Fault and Strict Products Liability in Kansas: Reflections on the Distinction Between Initial Liability and Ultimate Loss Allocation,* 28 Kan.L. Rev. 25, 95 (1979).

Defendants argue that the contract specification defense may nonetheless apply in strict liability cases predicated on design or warning defects, because in such cases "the standard of liability is no different in a negligence count than a strict liability count." This argument probably has merit insofar as it relates to the absence of any warnings about the instruments' radioactive character: *Mays v. Ciba-Geigy Corp.,* 233 Kan. 38, 661 P.2d 348 (1983), makes it plain that a "strict liability" failure to warn claim is nothing but a negligence claim by a different name (indeed, it would be conceptually clearer simply to state that there is no such thing as a "strict liability" claim for breach of a duty to warn. *Cf. Prentice v. Acme Machine & Supply Co.,* 226 Kan. 406, 408, 601 P.2d 1093 (1979)).[1] In cases involving flaws in design, however, the Kansas Supreme Court has made it crystal clear that negligence claims are *not* equivalent to strict liability claims. In *Prentice, supra,* a case based solely on strict liability claims for defective design (the negligence claims

---

1. Of course, warnings may be relevant to strict liability claims in that an adequate warning can *prevent* a product from being unreasonably dangerous, *see* Restatement (Second) of Torts

§ 402A comment j, but the adequacy of any warning can scarcely be an issue in a no-warning case such as this one.

having been settled or abandoned before trial), the Court rejected as clearly erroneous jury instructions that "improperly presented negligence issues to the jury," and stated:

> The question of whether a manufacturer exercised ordinary care in the design of a product as raised in instruction two, is not a proper issue under the theory of strict liability. In addition, the duty to warn in instruction three would be proper in a negligence case, but is not proper here. . . .

226 Kan. at 408, 601 P.2d 1093. Similarly, in *Lester v. Magic Chef, Inc.*, 230 Kan. 643, 650–54, 641 P.2d 353 (1982), a strict liability case involving an alleged design defect, the Court expressly rejected the "risk-benefit test" of *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)—a test suffused with negligence concepts—in favor of a "consumer expectation test" that defines the standards of strict liability in terms of the objective characteristics of the product (as viewed by the consumer) rather than in terms of the reasonableness of the designer's actions. *See also* 2 L. Frumer & M. Friedman, *Products Liability*, § 16A[4][f][iv][D], at 3B–136.2(v) (1983). Under Kansas law, defendants' assertion that there is no difference between defective design and negligent design is simply wrong.

Now it may well turn out that these defendants will be able to invoke the contract specification defense to defeat plaintiffs' claims of negligence, but at this point they have not established the essential facts beyond controversy, and are thus not entitled to summary judgment. In the first place, the injury-causing aspects of the instruments have not been shown to be required by the contract specifications. For example, the specifications presumably required that the instrument dials be self-luminous, but it has not been shown to the Court that this specification could not have been met by employing a luminous compound much less dangerous than the Radium 226 plaintiffs would cast as chief villain: in fact, these defendants admit that they have been unable to obtain copies of the relevant specifications. Nor has it been shown that any specification would have forbidden warnings of dangerous radioactivity on the instruments themselves, or in the instrument manuals; indeed, plaintiffs contend that language contained in manuals incorporated by reference in the specifications can be interpreted as *requiring* warnings.[2] Moreover, on plaintiffs' version of the facts, defendant Lewis manufactured some of the radioactivity instruments for commercial customers other than the United States.

Even if it were factually undisputed that government contract specifications mandated radium dials and forbade warnings on all of these instruments, summary judgment would be inappropriate. Plaintiffs have shown both that Radium 226 is extraordinarily dangerous stuff, and that knowledge of the substance's hazardous characteristics was generally available long before the manufacture of the instruments at issue here; moreover, the record before the Court is essentially silent as to the relative knowledge of these defendants and their military customers about radioactive hazards, and thus the standard of care to which GM and Lewis ought to have adhered cannot be pinpointed. The circumstances that led to the "decision" to manufacture instruments with radium dials has not been illuminated, and the record is simply too murky to allow any decisive determination as to whether a reasonable manufacturer in defendants' shoes "would realize that there was a grave chance that his product would

---

2. Defendants' sole support for their contentions that warnings were forbidden by the contract specifications are self-serving affidavits that amalgamate hazy 40-year-old memories, ancient hearsay, unsupported conclusions, and open speculation as to the likely government response to any attempt at a warning (although no such attempt ever took place). Even apart from plaintiffs' counteraffidavits, or their attacks on the admissibility of defendants' proffered testimony, these affidavits of GM and Lewis employees present on their face sufficiently serious questions of credibility and reliability as to preclude summary judgment. *See* 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure, § 2726 (1983).

be dangerously unsafe," Restatement (Second) of Torts § 404 comment a (1965): as one court has put it, "summary judgment is usually not appropriate in negligence cases, ... because the application of the reasonable person standard normally requires a full exposition of all the underlying facts and circumstances." *Barron v. Honeywell, Inc.,* 69 F.R.D. 390 (E.D.Pa. 1975) (citations omitted). *See also* Restatement (Second) of Torts §§ 328B, C (1965) (defining separate functions of judge and jury in negligence cases).

▮▮▮ Unlike the contract specification defense, the government contract defense is not based on ordinary negligence principles, and applies only where the product in question has been manufactured pursuant to a contract with the government. This defense has been characterized as one that "allows the contractor to 'share' the government's immunity from suit on grounds of public policy," and is potentially applicable in a wide variety of tort actions. Note, *supra,* 23 B.C.L.Rev. at 1048–49. Like the contract specification defense, the government contract defense only applies where the injury-causing aspect of the product was mandated by the contract, *see id.* at 1053; *Agent Orange, supra,* 506 F.Supp. at 795–96; *but see McKay v. Rockwell International Corp.,* 704 F.2d 444, 450 (9th Cir. 1983). Since, as discussed above, there is a definite factual dispute between plaintiffs and defendants as to whether the contract specifications required radium dials or forbade warnings, summary judgment based on the government contract defense is unwarranted. The Court also believes, however, that even on defendants' version of the facts, the government contract defense—unlike the contract specification defense—has no application in this case, because the policies that might have justified the defense in other cases do not justify it here.

The government contract defense was developed in a substantial body of case law involving claims against public works contractors for damages to land and other property, *see generally* Annotation, *Right of Contractor with Federal, State, or Local Public Body to Latter's Immunity from Tort Liability,* 9 A.L.R.3d 382 (1966); [3] *note, supra,* 23 B.C.L.Rev. at 1049–55. Under this case law the public contractor was generally deemed to share the sovereign's immunity from tort liability, and the injured owner's sole remedy, if any, would be against the state for the "taking" of his property. *See, e.g., Moore v. Clark,* 235 N.C. 364, 70 S.E.2d 182 (1952); *Tillotson v. Fair,* 160 Kan. 81, 159 P.2d 471 (1945). Two major exceptions to that immunity, however, were open: it was universally recognized that the contractor could be held liable if he were negligent in performing his duties, Annotation, *supra,* § 5, and many cases held that the contractor would be liable for damages resulting from the "ultrahazardous activity" of dynamite blasting. *Id.* §§ 7–9.

▮▮ In a handful of relatively recent cases, however, all involving products produced for the military, the government contract defense has been extended to products liability actions for personal injury. *See* Note, *supra,* 23 B.C.L.Rev. at 1055–64; *McKay, supra,* 704 F.2d at 448–49. A few courts have flatly rejected the doctrine, *see Challoner, supra; Foster v. Day & Zimmermann, Inc.,* 502 F.2d 867 (8th Cir.1974), but others have accepted it, *McKay, supra; Agent Orange, supra; Sanner v. Ford Motor Co.,* 144 N.J.Super. 1, 364 A.2d 43 (1976), *aff'd* 154 N.J.Super. 407, 381 A.2d 805 (1977), *cert. denied* 75 N.J. 616, 384 A.2d 846 (1978); *Casabianca v. Casabianca,* 104 Misc.2d 348, 428 N.Y.S.2d 400 (Sup.Ct.1980). An examination of the reasons proffered in these latter decisions to justify the doctrine, however, demonstrates that application of

---

**3.** This annotation does not distinguish between the contract specification and government contract defenses, and many of the cases it collects are most properly viewed as examples of the former than the latter. *See, e.g., id.* § 2[a], at 387; *Ryan v. Feeney & Sheehan Bldg. Co.,* 239 N.Y. 43, 145 N.E. 321 (1924).

the defense is not warranted in the present case.

One rationale for the government contract defense is that it lessens the risk to national security that might exist if either contractors or courts were put in the position of second guessing the design of military equipment. As the *McKay* court put it:

> [I]n setting specifications for military equipment, the United States is required by the exigencies of our defense effort to push technology towards its limits and thereby to incur risks beyond those that would be acceptable for ordinary consumer goods.

704 F.2d at 449–50. When the product in question is a new and technically complex one used only by the military—such as the ejection seat in *McKay*—the rationale has some force, but when the product is a simple adaptation or copy of one already sold in private commerce—as here—it does not: the *McKay* court recognized that the doctrine ought not apply to "an ordinary consumer product purchased by the armed forces—a can of beans, for example. . . ." 704 F.2d at 451.

A second rationale for the government contract defense is that if the contractor may be held liable for a product's design defects, then he will have to raise the price of the product so as to cover that risk, and the government will suffer increased costs. *See Casabianca, supra,* 428 N.Y.S.2d at 402. It must be recalled, however, that the government contract defense does not apply to manufacturing defects. *See, McKay,* 704 F.2d at 451. On what principled ground, then, could it be justified that the cost of manufacturing defects will be passed along, through higher contract prices to the government, to all of us who are taxpayers, while the design defect "tax" will fall only on a few unfortunate, innocent, randomly selected victims? In addition, as pointed out by the dissenting judge in *McKay,* imposing liability on the manufacturer can have a countervailing *beneficial* effect on governmental costs:

> If contractors are subject to products liability, then that factor will be reflected in their overall cost of doing business. This cost, of course, will ultimately dictate the price charged to customers.
>
> There is, however, no reason to believe that these costs are common, in amount and frequency, between all military equipment suppliers. Those with proven safety records may be able to secure liability insurance at much lower rates than less careful suppliers. Presumably, such cost savings enable these manufacturers to make lower bid prices and be more competitive. Because the Military is free to pursue and accept these lower bids, they help sharpen competition and keep the overall cost of bids down.

704 F.2d at 457 (Alarcon, J., dissenting).

A third rationale for the government contract defense is that it would be inequitable to impose liability on a contractor for a defect in a product he was forced by the government to make. As the *Agent Orange* court put it:

> Where, as here, manufacturers claim to have been compelled by federal law to produce a weapon of war without ability to negotiate specifications, contract price or terms, the potential for unfairly imposing liability becomes great. Without the government contract defense a manufacturer capable of producing military goods for government use would face the untenable position of choosing between severe penalties for failing to supply products necessary to conduct a war, and producing what the government requires but at a contract price that makes no provision for the need to insure against potential liability for design flaws in the government's plans.

506 F.Supp. at 794. There is no doubt that this spectre of inequity is a powerful justification for the government contract defense, *see* Comment, *The Government Contract Defense in Strict Liability Suits for Defective Design,* 48 U.Chi.L.Rev. 1031, 1051 (1981); Note, *supra,* 23 B.C.L.Rev. at 1072,

although it is not a completely sufficient rationale: in some situations the manufacturer might know that a design was dangerous and defective when the government did not, and it would not be sound policy to allow the manufacturer to nevertheless produce with impunity, without at least requiring him to share his knowledge with the government. *See Agent Orange, supra,* 534 F.Supp. at 1055; *note, supra,* 23 B.C.L.Rev. at 1072–73. In any case, whatever the knowledge of the defendants in the present case, this third rationale does not apply to them: unlike the *Agent Orange* defendants, who produced an allegedly dangerous herbicide for the military under the compulsion of the Defense Production Act of 1950, 50 U.S.C.App. § 2061 *et seq.,* GM and Lewis simply were not compelled to manufacture the instruments at issue here.[4]

A fourth rationale for the government contract defense is that it is necessary to vindicate the policies that underlie the governmental immunity established in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), or in the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). *See, e.g., McKay, supra,* 704 F.2d at 448–51. *Feres* immunity has no relevance to this lawsuit, however, since the injured individuals were not servicemen; nor has it been established that the United States will be able to invoke the discretionary function exception. Moreover, this rationale is based on the erroneous supposition that the fundamental purpose of the *Feres* and discretionary function immunities is to save the government money, and ignores the countervailing consideration mentioned above that allowing suits against the contractor may even lead to reduced costs, not to mention safer equipment.

A last rationale for the government contract defense is the unfairness of subjecting an innocent manufacturer to liability when

the blame more properly lies elsewhere. The *Agent Orange* court explained that:

> Tort liability principles properly seek to impose liability on the wrongdoer whose act or omission caused the injury, not on the otherwise innocent contractor whose only role in causing the injury was the proper performance of a plan supplied by the government. The imposition of tort liability on a wrongdoer can have a strong prophylactic effect; tortfeasors held liable for damages that flow from their wrongdoing have a strong incentive to prevent the occurrence of future harm.... Before any societal benefit can be derived from the deterrent effect of tort liability, however, the party in a position to correct the tortious act or omission must be held accountable for the damages caused and thus motivated to prevent future torts.

506 F.Supp. at 793–94 (citation omitted). It is, of course, difficult to argue with the principle that it is the wrongdoer who should bear the liability. At the same time, however, the manufacturer will not always be "innocent," particularly when he has had substantial input into the product's design: indeed, where the manufacturer is the "de facto" designer or has substantially greater sophistication than the government purchaser, the manufacturer may be more culpable than the ostensible designer. *See* Note, *supra,* 23 B.C.L.Rev. at 1036–38. A crude all or nothing rule that places all the liability on the government (or, if the government is immune, on the innocent plaintiff) even though the manufacturer has done some wrong, is no more equitable than one that imposes liability on the manufacturer in excess of his actual responsibility: the government contract defense, in some instances, does nothing more than replace one unfairness with another. It is unnecessary to choose between two crude, unattractive alternatives, however, because the Kansas comparative fault scheme, which applies in both negligence and strict

---

**4.** The Court cannot accept defendants' argument that they were "compelled" to manufacture the instruments because no equally profit- able alternative use of their factories presented itself at the time.

liability actions, *Kennedy v. City of Sawyer,* 228 Kan. 439, 618 P.2d 788 (1980), provides a sensitive alternative that apportions liability for plaintiffs' injuries not merely between the government and the manufacturers, but between all responsible parties, immune or not. *Albertson v. Volkswagenwerk Aktiengesellschaft,* 230 Kan. 368, 634 P.2d 1127 (1981).[5]

Defendants' last contention is that the recent case of *Mays v. Ciba-Geigy Corp.,* 233 Kan. 38, 661 P.2d 348 (1983), excuses them from liability on any claim based on a duty to warn. Defendants interpret *Mays* as standing for the proposition that there is no duty to warn another person's employee of a product's dangers if the employer ought to have been aware of those dangers: in the present case, defendants argue that AID management ought to have known of the dangers of radioactive instruments, and to have taken appropriate safety precautions, and that GM and Lewis therefore had no obligation to warn the workers at the AID plant.

The "principle" that defendants would have this Court extract from *Mays* is far too broad. It is hornbook law that:

> The duty to take precautions against the negligence of others [is] merely a matter of the customary process of multiplying the probability that such negligence will occur by the magnitude of the harm likely to result if it does, and weighing the result against the burden upon the defendant of exercising such care.

W. Prosser, Handbook of the Law of Torts § 33, at 172.[6] The *Mays* plaintiff was injured in a gas explosion that took place because his employer had made several serious mistakes in hooking up a new gas well to an existing separater. The products in question—plastic pipes and connectors—were not in themselves defective; nor were they inherently unsuitable for the use to which they were put. The *Mays* court explained in the following passage its holding that the defendants, Misco and Ciba-Geigy (the seller and manufacturer, respectively, of the pipes and connectors) had no duty to warn the plaintiff:

> Were Misco and/or Ciba-Geigy under some duty to instruct plaintiff in basic gas pipeline laying and system testing? We believe not. To hold otherwise would place an impossible burden on manufacturers and sellers of industrial products.
>
> As previously noted, the hooking up of a natural gas well is a highly specialized industrial activity. The danger of explosion and fire during such activities is common knowledge.... Misco and Ciba-Geigy are not under a duty to provide each employee of the installer of their products with a manual on proper installation and testing procedures or otherwise train such employees.

233 Kan. at 61, 661 P.2d 348. The factual differences between the present case and *Mays* could hardly be more striking. The plastic pipe in *Mays* was innocuous; the instruments here contain deadly radium. The danger of explosion when laying gas pipe line is obvious, and common knowledge; tragically, the dangers of radium painted instrument dials are relatively unappreciated, not merely at AID but, according to plaintiffs, at other instrument overhaul facilities as well—moreover, absent some warning, a radioactive instrument cannot be distinguished from an ordinary one by any of the five human senses. The warnings sought by the *Mays* plaintiff would place an "impossible burden" of instruction on the sellers; the warnings

---

**5.** Of course, it may well be that certain parties, because of a common legal obligation to plaintiff, might have to be "lumped together" for comparison purposes (*e.g.,* when several parties are in a single chain of supply and distribution, or can be regarded as a single enterprise or joint venture), and that joint and several liability might apply within any such group of

defendants. *See* Westerbeke & Meltzer, *supra,* 28 Kan.L.Rev. at 91–95.

**6.** Prosser also notes that "in many situations, where the risk is unduly great, it is not reasonable care to rely upon the responsibility of others," *id.* at 177.

sought here—stickers on instruments, bold-face lines in repair manuals, or warnings sent to a limited number of overhaul facilities—would be trivial in cost. In *Mays* no expert testimony supported the existence of any duty to warn; here, plaintiffs have retained several purportedly renowned experts who are of the opinion that the pre-eminent cause of radioactive contamination at the AID plant was defendants' failure to warn, and that the risks to instrument overhaul workers, including those at AID, would be both foreseeable and unreasonable in the absence of warnings. When these two very different factual patterns are plugged into the equation described by Prosser, the results are not merely different: they are not in the same ballpark.

For the reasons set forth in this memorandum, therefore, IT IS ORDERED that the summary judgment motions of defendants General Motors Corporation and Lewis Engineering Company be denied.

A status conference in this case is now scheduled for August 19, 1983, at 9:30 A.M. The Court has been informed that the United States and several of the supplier defendants intend to file motions for summary judgment, and has previously given them until that date to do so; the Court directs that any other defendants who intend to file substantive motions adhere to that same timetable. The Court also requests that, in advance of the status conference, defense counsel meet among themselves and with plaintiff counsel for purposes of drafting proposals for a pretrial order.