693 F.Supp. 528 (1986)
Gillian Major CROSSAN, Personal Representative of the Estate of Thomas Benjamin Crossan, III, Deceased, and Maria S. Sanchez, Personal Representative of the Estate of Louis A. Sanchez-Velez, Deceased, Plaintiffs,
v.
ELECTRON TUBE DIVISION, A DIVISION OF LITTON SYSTEMS, INC., Litton Electron Device, a Division of Litton Systems, Inc., Litton Systems, Inc., International Telephone and Telegraph, Inc., Farrand Controls, a Division of Prime Industries, Inc., Prime Industries, Inc., and Duracell International, Inc., jointly and severally, Defendants.
No. 86-CV-0268-DT.
United States District Court, E.D. Michigan, S.D.
December 3, 1986.
Paul G. Valentino, Birmingham, Mich., for plaintiff Crossan.
Scott R. Torpey, John R. Secrest, Farmington Hills, Mich., for defendant ITT.
George E. Petersmarck, Mt. Clemens, Mich., for defendants Electron Tube and Litton.
ORDER GRANTING DEFENDANT INTERNATIONAL TELEPHONE AND TELEGRAPH, INC.'S MOTION FOR SUMMARY JUDGMENT
WOODS, District Judge.
This matter is before the Court on defendant International Telephone and *529 Telegraph, Inc.'s (ITT) Motion for Summary Judgment. The Court has reviewed the pleadings, including defendant ITT's reply brief, the exhibits attached thereto, and the depositions of defendant ITT's experts, Ed Firth and George Giffin, and is otherwise fully informed in the matter.
At issue in this motion is whether defendant ITT is protected from liability for any failure of night vision goggles which might have been implicated in the crash of a CH-470 military helicopter on July 10, 1983. The suit was brought by the personal representatives of two men killed in the crash. Defendant ITT claims to be immune from liability as a matter of law due to the government contractor defense.
A preliminary question which was not addressed by the parties is whether to apply federal or state law. Although several of the opinions of the cases they cite rely on state law (Pennsylvania and Wisconsin), none rely on Michigan law, and most of them apply federal common law. Thus, the parties seem to assume that federal common law is the appropriate law to apply. The Court agrees with that for the reasons stated in Note, Government Contract Defense: Sharing the Protective Cloak of Sovereign Immunity After McKay v. Rockwell International Corp., 37 Baylor L.Rev. 181, 206-14 (1985) (hereinafter "Sharing the Protective Cloak").
A second preliminary matter not really addressed by the parties is whether or not the government contractor defense applies to all the theories of recovery alleged by plaintiffsstrict liability, negligence, and breach of warranty. The Court finds that the reasons for the application of this defense to one theory of recovery applies equally well to the other theories, so that the defense is equally applicable to all of plaintiffs' theories. See Tozer v. LTV Corp., 792 F.2d 403 (4th Cir.1986), and Sharing the Protective Cloak at 214-18.
There have been a number of recent cases dealing with the government contractor defense. Different courts have construed it more or less narrowly. Compare McKay v. Rockwell, 704 F.2d 444, 451 (9th Cir.1982), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984) ("the scope of the government contractor rule should be drawn somewhat ... broadly"), with Shaw v. Grumman Aerospace Corp., 778 F.2d 736, 741 (11th Cir.1985) ("in recognizing a defense to liability for military contractors, we carefully frame a narrow exception to the product liability law"). At the minimum, however, the Courts "recognize a military contractor defense in this Circuit based exclusively on the theory that the constitutional separation of powers compels the judiciary to defer to a military decision to use a weapon or weapons system (or a part thereof) designed by an independent contractor, despite its risks to servicemen." Shaw at 743. Since that case involved an airplane crash, apparently due to the failure of a bolt in the longitudinal flight control system of the aircraft manufactured by defendant, it appears that even the Shaw court would define "weapon" broadly enough to include the night vision goggles at issue in this case.
Thus the central issue for the Shaw court is whether "or not a military judgment to go ahead with a dangerous design was actually made." Id. at 746. Since the military is not before the Court, "[w]e may only require from the contractor proof ... that the design in question does not merely represent a judgment by the supplier." Id. at 745. In a case like this, where the contractor clearly participated in the design of the product, the test applied by the Shaw court boils down to a determination that the contractor both warned the military of the risks of the product or product part that it designed and informed it of design alternatives "reasonably known" to the contractor. The contractor must further show "`that the military, although forewarned, clearly authorized the contractor to proceed with the dangerous design.'" Shaw at 746.
In Shaw it was clear what the defect was which caused plaintiff's injury. In this case it is not. The plaintiffs allege that defendant ITT "failed to use adequate care in the design of the night vision goggles for aviation use." Complaint at ¶ 2b. The undisputed evidence shows, however, that *530 the decision as to the use to which these goggles were to be put was the exclusive province of the government. See depositions of Ed Firth and George Giffin. All of the field tests were conducted by the government, and it was the former employee of the government's Night Vision Laboratory, Ed Firth, who expressed grave concerns about the wisdom of using these goggles for aviation because of their limited range of vision. Thus the undisputed facts show that the design decision apparently at issue was not within the contractor's control, thus obviating any need to warn. In this context the comparable test, as stated by the McKay court seems more appropriate the supplier warned the United States about ... dangers involved in the use of the equipment that were known to the supplier but not to the United States. McKay at 451.
Plaintiffs contend that the evidence shows that George Giffin, ITT's project manager on this project knew about serious design defects. The Court has read the entire transcript of Giffin's testimony, and does not find that it establishes such knowledge. The following testimony seems to be the most probative on this question:
Q. Did ITT conduct any tests at any time with regard to the use of these night vision goggles in helicopters?
A. [No.]
Q. Did ITT at any time issue any warnings to the Army with regard to using these night vision goggles in aviation?
A. Not that I know of.
Q. At any time was ITT concerned with the use of night vision goggles in aviation?
A. I don't know how to answer your question. I don't want to express we had no concern about the use of them in goggles.
Q. You mean aviation?
A. In aviation. But we knew what the Army was doing with use of the goggles in aviation, helicopters in terms of a lot of testing and evaluations that they had done. And they had all that information and not us. So I don't know how to respond to your question.
Giffin deposition at 110-11.
Even if this testimony is taken to show knowledge on the part of ITT of dangers in using the goggles in helicopters, it also clearly establishes the superior knowledge of the government, and does not preclude summary judgment.
In light of this the Court finds it unnecessary to delve into the complexities of what was clearly a "back and forth" joint effort between the contractor and the government in designing these innovative goggles. Thus, even if there are genuine factual disputes as to whether or not reasonably precise design specifications were provided to ITT by the government in 1968, there is no genuine material issue of fact which would preclude the application of the government contractor defense to ITT for alleged design defects for products manufactured according to government-approved specifications according to a government contract.
Plaintiffs maintain that there are genuine issues of material fact as to whether or not the goggles on board the aircraft which crashed met the government's specifications. Defendant has supplied copies of "Material Inspection and Receiving Reports" for shipments including all six of the goggles shown to be on the aircraft. Exhibit B to ITT's Reply to Plaintiffs' Brief Opposing Summary Judgment.
ITT's reply brief states that each of the subject goggles was inspected for compliance with the military specifications prior to acceptance. The specifications themselves, however, seem to provide for inspection of samples from lots. Since Exhibit B seems to deal with the goggles in lots, it may be that not each one of them was individually inspected. Nonetheless, ITT has provided ample evidence that the goggles in question were produced in accordance with stringent quality assurance measures designed by the government to assure high quality; that the government was on site to perform inspections itself; and that the goggles in question were accepted by the army. The Court finds that *531 this is enough to establish the presumption that the goggles in question were manufactured in accord with the specifications, and did not suffer from a manufacturing defect.
Furthermore, plaintiffs have the burden of proving a manufacturing defect in order to prevail on that theory. The only evidence they have produced is deposition testimony from another pilot on the same mission who reported two instances of "spatial disorientation" just prior to the accident. It is undisputed, however, that the pilot of the airplane which crashed did not report any such problems. Since the goggles cannot be recovered as they were destroyed in the crash, this is all that plaintiffs will ever be able to produce. To allow the question of manufacturing defect to go to the jury with such slight factual basis would be simply to invite jury speculation. Summary judgment is therefore appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Plaintiffs also argue that some of the goggles on board may not have been provided pursuant to government contract, so that ITT could not invoke the government contractor defense with reference to those goggles. They base this argument on the fact that three of the goggles' serial numbers, as listed on the "Survey Report" issued by the government after the incident, failed to include the letter "G", which indicated goggles produced by ITT in accord with government contract. Nonetheless ITT has provided documentation showing that those serial numbers were among those accepted by the government. Therefore, the assumption by ITT's experts that somehow the suffix was merely omitted at some point seems inescapable.
For the above reasons the Court concludes that ITT is protected from liability by the government contractor defense. IT IS HEREBY ORDERED that defendant ITT's motion be GRANTED.
SO ORDERED.